IN THE UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH CAROLINA

CHARLESTON DIVISION

| | |
|---|---|
| WEICHERT REAL ESTATE AFFILIATES, INC., ) ) ) Plaintiff, ) ) v. ) ) DEAN KELBY REALTY, LLC; ) KELVAK HOLDINGS, INC.; ) KELVAK HOLDINGS, LLC; ) BRYAN CRABTREE and SANDION, ) a Texas general partnership d/b/a ) COLDWELL BANKER UNITED, ) REALTORS, ) ) Defendants. ) ) | Civil Action No. 2:08-2652-PMD-BM **REPORT AND RECOMMENDATION** |

This action has been filed by the Plaintiff, asserting various breach of contract claims against the Defendants. A default judgment has been entered against the Defendants Dean Kelby Realty, LLC, Kelvak Holdings, LLC, and Kelvak Holdings, Inc. See Court Docket Nos. 68, 72. The Defendant Bryan Crabtree is in bankruptcy, and the case has been stayed with respect to that Defendant. See Court Docket Nos. 73, 74.

The Defendant Sandion filed a motion for summary judgment pursuant to Rule 56, Fed.R.Civ.P. on January 7, 2010. Plaintiff filed a response in opposition to the motion for summary judgment that same date, following which Sandion filed a reply memorandum on January 19, 2010.

1



Sandion's motion is now before the Court for disposition.[1]

**Background and Evidence**[2]

Plaintiff asserts claims against the Defendant Sandion in its Seventh and Eight Causes of Action. In its Seventh Cause of Action, Plaintiff asserts a claim for tortious interference with contract, and in its Eighth Cause of Action Plaintiff asserts a claim for intentional interference with prospective contractual relations.

The evidence before the Court shows that Plaintiff entered into franchise agreements with the Defendant Dean Kelby for the operation of real estate brokerage and related services businesses in the Charleston area. Crabtree was the principal of Dean Kelby. It is undisputed that during 2007 and 2008 Dean Kelby was experiencing business and financial hardship, resulting in Dean Kelby having to sell one of its Charleston area franchise offices. This sale was effective February 18, 2008, and was accomplished with the knowledge and consent of the Plaintiff. Crabtree Deposition, pp. 42-43, 71, 179; Rueter Deposition, pp. 28-30. Dean Kelby also had to merge other franchise operations in the Charleston area due to financial problems, which were also accomplished with the approval and consent of the Plaintiff. Crabtree Deposition, pp. 37-38, 44, 73. These mergers left only two (2) offices remaining: one in Mt. Pleasant and one in Summerville.

Dean Kelby continued to encounter business difficulties, and Crabtree explored a number of options for what to do, including inquiring with other brokers to determine their interest

---

[1] This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of 28 U.S.C. § 636(b)(1)(A) and (B) and Local Rule 73.02(B)(2)(g), D.S.C. The Defendant Sandion filed a motion for summary judgment. As this is a dispositive motion, this Report and Recommendation is entered for review by the Court.

[2] The facts and evidence are considered and discussed in this Report and Recommendation in the light most favorable to the Plaintiff, the party opposing summary judgment. Pittman v. Nelms, 87 F.3d 116, 118 (4th Cir. 1996).

2



in purchasing his business, as well as possible bankruptcy. Crabtree Deposition, pp. 75-79, 112. One of the other brokerages he contacted was the Defendant Sandion. However, Plaintiff was not aware that Dean Kelby was considering the closure, sale or transfer of its remaining franchise real estate offices in the Charleston area. Rueter Deposition, pp. 40, 50-51.[3]

In January 2008, Crabtree began discussions with Sandion concerning a possible sale to Sandion of his remaining franchises in Charleston. Crabtree advised Sandion that he was going to terminate his franchise relationships with the Plaintiff, and inquired as to any interest Sandion had in forming a relationship going forward. Crabtree Deposition, pp. 87-88; Wheeler Deposition, pp. 101-103, 121-123. Again, Plaintiff was not aware of these discussion. Rueter Deposition, pp. 51-52, 57-58. Crabtree testified that he was advised by Jeffery Wheeler (Sandion's President and Chief Operating Officer) that they were "wanting us to no longer be in a franchise [ ] . . . [b]efore they would even consider going forward . . . ." Crabtree Deposition, p. 113. Crabtree indicated that he was going to go back and talk to his attorney, at which point both parties "backed away". Id., pp. 114-115. Sandion's counsel also sent an email to Crabtree's counsel in March 2008 which read:

> My client understood that your client intended to terminate his franchise relationship with [the Plaintiff]. Is that the case and if so, where are you on this plan? As Jeff Wheeler indicated to your client when first contacted by your client, he did not want to interfere with your client's existing franchise relationship so he could not discuss the matter.

See Defendant's Exhibit D.

However, notwithstanding these comments, discussions did continue, and on or about March 19, 2008, Sandion was provided a copy of Dean Kelby's franchise agreement with the Plaintiff

---

[3]While Sandion contends that Plaintiff was aware of Dean Kelby's activities; Crabtree Deposition, p. 179; since Plaintiff disputes this assertion, the undersigned has assumed Plaintiff's version of this event to be true for purposes of summary judgment. Pittman, 87 F.3d at 118.



as well as Crabtree's confidentiality/non-competition agreement and guarantee agreements. <u>Plaintiff's Exhibit 16</u>. On March 20, 2008, Wheeler sent Richard Smith, Sandion's sole owner and managing general partner, a memorandum outlining a business development plan for the Charleston area. This memorandum discussed the operation of Crabtree's Weichert franchise in Charleston (both locations - one in Summerville and one in Mt. Pleasant), and discussed an acquisition plan for those businesses. <u>Plaintiff's Exhibit 13</u>, p. 2. <u>See</u> also, <u>Plaintiff's Exhibit 14</u>. Smith approved moving forward, even though the franchise agreements remained in place.

When Wheeler advised Smith that there were franchise agreements in place, Smith told Wheeler to speak to counsel about that. <u>Wheeler Deposition</u>, pp. 130-131. However, in an email dated March 21, 2008, Crabtree advised Wheeler that, although Sandion wanted his franchise to be terminated before they negotiated a deal, he "simply [could not] do that." Crabtree further told Wheeler in that email:

> If we terminate before hand and a deal does not happen, that is one problem. But, if we terminate beforehand - more likely - it tips our hand and gives our competition a window of opportunity that will highly damage our ability to make this a high retention smooth deal (in my opinion). My managers and I feel as if this will be a highly visible, highly rumor mill event which [Sandion] can fully capitalize on - but the moment we terminate with [the Plaintiff], it will be all over town via other in market contacts they have.
>
> I don't really see this as a company sale as much as it is a technical asset sale in which you are offering jobs to existing folks - while we close the old firm. I understand that anyone can bring suit against anyone - but in this case you clearly aren't interfering with my [Plaintiff] contract.

<u>See</u> Defendant's Exhibit E.

Notwithstanding this email, the evidence shows that Wheeler continued to have discussions with Crabtree during April and May (after Crabtree's March 21 email advising he was not going to terminate his franchise agreements pre-sale) concerning a potential purchase and sale by



Sandion. Id., pp. 135-136. Indeed, by March 28, 2008 (one week after Crabtree's March 21 email), the details of the agreement were essentially worked out. Plaintiff's Exhibit 21.

Crabtree spoke again with Wheeler in April 2009, and told him he was "going to close the company one way or the other. I am not going to continue operating it." Crabtree Deposition., p. 116. Crabtree proposed to Wheeler that Sandion buy some of his assets and that he [Crabtree] would work for Sandion as a broker and bring all of his agents, with Crabtree terminating his franchise with the Plaintiff. Crabtree testified:

> So they agreed to acquire those assets in one agreement, and then I agreed to take a job in another. And I then recruited from my company my own agents and most of them came over, and I took a job in what eventually became Summerville.

Id., p. 117.

In an email dated April 3, 2008, Wheeler told Crabtree that he needed to get a full release from the Plaintiff in advance, but although he stated in this email that Sandion was "not encouraging you to terminate your franchise agreement", he then went on to discuss the financial terms of Sandion's purchase of Crabtree's franchises. Plaintiff's Exhibit 22. A draft letter of intent was then prepared which included, inter alia, the following paragraph:

> Consummation of the transaction proposed by this letter is expressly conditioned upon you obtaining from Weichert Realtors a complete release of any and all claims that Weichert, Realtors may have against (a) you or Dean-Kilby under the franchise agreement(s) between Dean-Kilby and Weichert Realtors, and (b) against [Sandion] arising out of or relating in any way to the transaction proposed in this letter. [Sandion] will not proceed with the proposed transaction without such a release.

Plaintiff's Exhibit 23, p. 3.[4]

Crabtree testified that there was give and take between the attorneys for the next ten to twelve days,

---

[4] Although this letter is dated February 27, 2009, Wheeler testified that it was prepared in April 2008. Wheeler Deposition, pp. 154-156.



5

during which Crabtree told Wheeler that Plaintiff was in breach of contract and that he felt from discussions with his attorney that he would be obtaining a release from the Plaintiff. Crabtree testified that Wheeler responded by telling him "in essence that nothing we are discussing has to deal [the Plaintiff]. We are basically talking about an asset purchase and a job. So he was very quick to respond to that that basically in no way was he encouraging me to do anything." Crabtree Deposition, p. 119.

Although Wheeler testified that he was (at least initially) advised by Crabtree that he was going to secure a release from the Plaintiff, and that he told Crabtree that would have to be resolved before "we could do anything"; Wheeler Deposition, p. 134; at some point Crabtree told Wheeler he would not be obtaining a release from the Plaintiff. Wheeler testified that he again told Crabtree that they would not move forward without a release. Wheeler also testified that the attorneys were working on securing a release, and that he and Crabtree did not thereafter have any further conversation concerning the Weichert relationship or the Weichert franchise agreements until the actual closing. Id., p. 137. However, the evidence reflects that Sandion subsequently agreed to proceed with the purchase without Crabtree first having to obtain a release from the Plaintiff. In a revised letter of intent, executed May 6, 2008, the requirement of obtaining a release from the Plaintiff pre-closing was deleted, and replaced with a requirement that Sandion instead be indemnified against any and all claims, with Crabtree to attempt to obtain a release from the Plaintiff post-closing. Crabtree executed this indemnity agreement on May 9, 2008; Plaintiff's Exhibit 26; and Dean Kelby and Sandion executed an asset purchase and sale agreement on May 23, 2008. Plaintiff's Exhibit 28. Plaintiff was not advised of any of these discussions, plans or transactions. Crabtree Deposition, pp. 123, 128; Reuter Deposition, pp. 41-44.



The asset purchase and sale agreement was effective May 27, 2008. Although the revised letter of intent provided that, prior to closing, Dean Kelby was to demonstrate that it had provided written notice to the Plaintiff of its intent to terminate its franchise agreement, Crabtree did not advise Plaintiff that Dean Kelby was terminating its two remaining franchise agreements prior to execution of the agreement with Sandion. Instead, Crabtree sent a letter to Plaintiff, dated May 22, 2008, by regular mail and which was received by the Plaintiff on May 27, 2008. That letter advised Plaintiff that Dean Kelby was terminating its franchise agreements effective that same date, May 27, 2008, and requested a full release of all claims and debts from the Plaintiff. Plaintiff's Exhibit 27.

## Discussion

Defendant Sandion seeks summary judgment on both of Plaintiff's causes of action. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The moving party has the burden of proving that judgment on the pleadings is appropriate. Once the moving party makes this showing, however, the opposing party must respond to the motion with "specific facts showing there is a genuine issue for trial." Rule 56(e), Fed.R.Civ.P.

## I.

### (Tortious Interference with Contract)

The elements of the cause of action for tortious interference with contract under South Carolina law are: 1) the existence of a valid contract; 2) the other party's knowledge thereof; 3) the



other party's intentional procurement of the breach of the contract; 4) the absence of justification; and 5) resulting damages. Camp v. Springs Mortgage Corporation, 426 S.E.2d 304, 305 (S.C.Ct.App. 1993); BCD, LLC v. BMW Mfgs. Co., LLC, No. 05-2152, 2008 WL 304878, at * 16 (D.S.C. Jan. 31, 2008). For purposes of its motion for summary judgment, Defendant disputes the establishment by the Plaintiff of elements three and five.

**a. Intentional procurement**. Defendant argues that the evidence does not show that it procured the breach of the franchise agreements between Plaintiff and Dean Kelby. Rather, the Defendant argues that Crabtree had already made an independent decision to leave the Plaintiff and to unilaterally terminate the franchise agreements. Defendant further argues that the evidence clearly shows that it was Crabtree who approached Sandion, and argues that there is no evidence establishing that Sandion did anything to induce, entice, or in anyway procure Dean Kelby/Crabtree's breach of the franchise agreements with the Plaintiff. However, after careful review and consideration of the evidence submitted in conjunction with the applicable case law, the undersigned finds and concludes that a sufficient issue of fact exists to defeat summary judgment on this claim.

Like most states, South Carolina looks to the Restatement (Second) of Torts for guidance concerning the elements of the tort of inference with contract. See, e.g., Waldrep Brothers Beauty Supply, Inc. v. Wynn Beauty Supply Co., 992 F.2d 59 (4th Cir. 1993). Under the Restatement, intentional interference can exist where the "actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his action." Restatement (Second) of Torts, § 766, Cmt. j.; cf. Union of Needletrades, Indus. and Textile Employees AFL-CIO v. American, 546 F.Supp.2d 546, 561 (S.D.Ohio 2008)["Intentional means that the actor . . . know[s] that breach of contract is substantially certain to result from the



interference"]; Gianacopoulos v. Moss Design, Inc., No. 05-2417, 2008 WL 1774094, at * 5 (M.D.Pa. Apr. 16, 2008)[Element of intent can be satisfied by establishing knowledge that a breach is the likely result of a Defendant's actions].

Here, the evidence is sufficient to create a genuine issue of fact as to whether Sandion knew that Crabtree had not told Plaintiff of his intention to cancel his franchise agreements, and that despite this knowledge the Defendant continued to negotiate with Crabtree for the purchase of his business. The evidence shows extensive negotiations between these two parties, the fact that an agreement was reached between the parties for the purchase of the business prior to the Plaintiff receiving any notice thereof, and that the sale and purchase of the business was actually consummated prior to the Plaintiff receiving any notice whatsoever that its franchise was being terminated. The evidence further shows that Sandion had a copy of Dean Kelby's franchise agreement, and an issue of fact exists as to whether the Defendant knew that the sale by Crabtree of his business without notice to the Plaintiff would constitute a breach of that franchise agreement. See Plaintiff's Exhibit 16, ¶ 60, 103-105. A finder of fact could also infer that Sandion's revision of the letter of intent to delete the requirement that Crabtree obtain a release from the Plaintiff prior to the sale of his businesses was a further inducement for him to proceed with the sale of his business, which Sandion obviously wanted to purchase. See Plaintiff's Exhibits 23-24, 26. A reasonable inference would also be that Sandion did not require Crabtree to demonstrate that Dean Kelby had provided written notice to the Plaintiff of its intent to terminate its franchise agreement prior to the closing, even though that was purportedly a requirement for the closing, and that Crabtree did not in fact do so, which also induced Crabtree to proceed with the transaction. Plaintiff's Exhibit 26, p. 3.

The sale of the business by Crabtree without notice and a release from the Plaintiff, the



fact that the terms of the sale with Sandion demonstrated that the business had real value, and the favorable terms of the agreement which included Crabtree receiving a cash payment, all give rise to an issue of fact as to whether an improper inducement occurred in this case. Cf. Prudential Real Estate Affiliates, Inc. v. Long & Foster Real Estate, Inc., No. 99-1357, 2000 WL 248170, at * 6-7 (4th Cir. Mar. 6, 2000). Therefore, the Defendant is not entitled to summary judgment on this ground. Cole v. Cole, 633 F.2d 1083, 1092 (4th Cir. 1980)[On summary judgment, the Court is required to consider the evidence presented, and all inferences to be drawn from that evidence, in the light most favorable to the non-moving party]; see Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985), over-ruled on other grounds, 490 U.S. 228 (1989); Gray v. Spillman, 925 F.2d 90, 95 (4th Cir. 1991)[When considering whether summary judgment for the Defendants is appropriate, the Court must assume that the Plaintiff's version of the facts is true].

**b. Damages**. Even if Plaintiff has submitted sufficient evidence to give rise to a question of fact with respect to inducement, Defendant argues that there is no evidence of actual damages caused by the allegedly tortious conduct of the Defendant, entitling the Defendant to summary judgment on this cause of action. See Collins Music Co., Inc., v. Ingram, et. al., 357 S.E.2d 484, 486-487 (S.C.Ct.App. 1987)["To establish an action for intentional interference with a contract, a Plaintiff must establish not only that the Defendant wilfully procured breach of an existing contract, but also that damages resulted from that breach"]. Defendant argues that Plaintiff's only proof of damages will be Crabtree's pre-asset sale delinquencies, which are not recoverable from Sandion under any theory, and the liquidated damages formula contained in the franchise agreements between Plaintiff and Dean Kelby, which are also not recoverable in a tortious interference case.

Plaintiff asserts that, as a result of the Defendant Sandion's actions, it has incurred



monetary damages as of June 12, 2008 of $81,675.63 for overdue royalties, marketing fund payments, broker counsel dues, and other payments arising from the franchise agreements, as well as liquidated damages in the amount $516,878.52.  See Plaintiff's Exhibits 1, 3; Exhibit 4 (Keenan Affidavit, ¶ ¶ 5, 7, 8).  Defendant argues that liquidated damages are agreed upon damages by the parties to a contract prior to breach, and are not therefore actual damages as they are not measured at the time of a breach, citing to Beckmann Concrete Contractors, Inc. v. United Fire and Cas. Co., 600 S.E.2d 76 (S.C.Ct.App. 2004).  However, Plaintiff argues that the "liquidated" damages calculation is a contractual estimation of the actual damages sustained by the Plaintiff as a result of the premature termination of the franchise agreements, calculated by using the number of months that were remaining on the terms of the franchise agreements with the average monthly revenue due to the Plaintiff under those franchise agreements over the prior twelve months, reduced to a present value. Plaintiff argues that these are actual lost profit damages, and that the evidence submitted is more than sufficient to create an issue of fact as to whether it is entitled to damages, and to what amount of damages.  The undersigned agrees.

The calculation of damages based on an average monthly revenue loss to the Plaintiff for the remaining term of the franchise agreements *could* be found by a trier of fact to be a valid measure of actual damages suffered by the Plaintiff in the event Defendant is found to have tortiously interfered with Plaintiff's contract with Dean Kelby.  See Restatement (Second) of Torts, § 766 ["One who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract"]; cf. Republic Textile Equipment Co. of South Carolina, Inc. v. Aetna



11

Ins. Co., 360 S.E.2d 540, 545 (S.C.Ct.App. 1987)[Plaintiff's showing of lost profits from historical data was sufficient to show lost profits by reasonable inferences]; Petty v. Weyerhaeuser Co., 342 S.E.2d 611, 615 (S.C.Ct.App. 1986)["The problematic nature of proving damages for loss of profits in a tort action will not prevent recovery where, as here, the Plaintiff can make 'fair and reasonable approximation of them.'"] (quoting South Carolina Finance Corp. of Anderson v. Westside Finance Co., 113 S.E.2d 329, 337 (S.C. 1960); Teen-Ed, Inc. v. Kimball Int'l, Inc., 620 F.2d 399, 402-403 (3d Cir. 1980)[Where Plaintiff, an authorized dealer of Defendant's product for five years, used historical gross profit margin and historical gross sales to determine lost profits]; John Morrell & Co., v. Local Union 304 A of the United Food and Commercial Workers, 913 F.2d 544, 558 (8th Cir. 1990)[Evidence of damages is sufficient as long as it is not wholly speculative and permits the jury to approximate damages on the basis of just and reasonable inferences].

The Defendant is not therefore entitled to summary judgment on Plaintiff's tortuous interference claim based on its argument that Plaintiff has failed to present evidence of actual damages caused by the tortious conduct of the Defendant. Cf. Collins Music Co., Inc. v. Ingram, et al., 357 S.E.2d 484, 486 (S.C.Ct.App. 1987)[Proof of lost profits requires the Plaintiff to prove 1) that it is reasonably certain that profits would have been realized but for the tort, and 2) that such lost profits can be ascertained and measured from the evidence produced with reasonable certainty.]; Kinard v. Crosby, 433 S.E.2d 835, 840 (S.C. 1993)[same]; Petty v. Weyerhaeuser, supra; see also Miranda v. B&B Cash Grocery Store, Inc., 975 F.2d 1518, 1534 (11th Cir. 1992)["If reasonable minds could differ on the inferences arising from disputed facts, then a court should deny summary judgment"]; Boutros v. Canton Regional Transit Authority, 997 F.2d 198, 202 (6th Cir. 1993)["[I]t is not the function of the trial court but rather that of the jury to make credibility determinations on disputed



questions of fact . . . [a]ll credibility questions must be considered most favorably to the non-moving party, and their resolution left to the jury"].

## II.

### (Intentional Interference with Prospective Contractual Relations)

In its Eighth Cause of Action, Plaintiff alleges that Sandion's inducement of Dean Kelby and Crabtree to breach their franchise agreements and confidentiality/non-competition agreements, respectively, constitutes an intentional interference with the Plaintiff's economic and business relationships and potential contractual relationships with its current and potential customers and current and potential sales representatives, constituting an intentional interference with prospective contractual relations. In order to maintain a claim for intentional interference with prospective contractual relations, Plaintiff must establish 1) intentional interference with prospective contractual relations; 2) for an improper purpose or by improper methods; and 3) resulting injury. Crandall Corp. v. Navistar Int'l. Transp. Corp., 395 S.E.2d 179, 180 (S.C. 1990).

Defendant argues that this claim is without merit because there was a contract in place here (the franchise agreements), and Plaintiff cannot pursue a separate cause of action for intentional interference with prospective contractual relations where an actual contract is involved, citing to Egrets Pointe POA, et al. v. Communities, Inc., 870 F.Supp. 110, 116 (D.S.C. 1994)["[A]uthority discussing this tort usually require the aggrieved party to have been unsuccessful in acquiring an expected contract due to a third party's intentional and wrongful actions"]. In response to Defendant's motion, Plaintiff has not contested Defendant's argument and has agreed to dismiss this cause of action. See Court Docket No. 101.

Therefore, this cause of action should be dismissed.



13

**Conclusion**

Based on the foregoing, it is recommended that the Defendant's motion for summary judgment with respect to the Plaintiff's Seventh Cause of Action be **denied** for the reasons stated. Plaintiff is withdrawing its Eighth Course of Action, and Defendant's motion with respect to Plaintiff's Eighth Cause of Action should therefore be **granted**, with prejudice.

The parties are referred to the notice page attached hereto.

_____
Bristow Marchant
United States Magistrate Judge

August 3, 2010
Charleston, South Carolina

14



**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a Defendants' Exhibit novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

> Larry W. Propes, Clerk
> United States District Court
> Post Office Box 835
> Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

